Belknap
No. 94-076

THE STATE OF NEW HAMPSHIRE

v.

FRANCIS CAVALIERE

August 9, 1995

*Jeffrey R. Howard*, attorney general (*Ann M. Rice*, assistant attorney general, on the brief and orally), for the State.

*Pizzimenti & Immen*, of Concord (*Dennis Pizzimenti* on the brief and orally), for the defendant.

BROCK, C.J. In this interlocutory appeal from ruling, *see* SUP. CT. R. 8, the State appeals an order of the Superior Court (*Smukler*, J.)

permitting the defendant to introduce, by expert testimony, evidence that he does not fit into a "sexual offender profile." We reverse and remand.

The defendant, Francis Cavaliere, was charged with four counts of felonious sexual assault, RSA 632-A:3 (1986), and two counts of attempted felonious sexual assault, RSA 629:1 (1986); RSA 632-A:3, alleged to have been committed against a teenaged boy. Prior to trial, the defendant informed the State that he intended to call an expert witness who would testify that the defendant's psychological profile is not consistent with that of a sexual offender. The trial court ruled the evidence admissible, holding that it is relevant under New Hampshire Rules of Evidence 401(a)(1) and 404(a), and that it is admissible under Rule 702 under the standard enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 113 S. Ct. 2786 (1993). Finally, the court concluded that the evidence is admissible under Rule 403, finding that the probative value of the testimony would not be substantially outweighed by the danger of unfair prejudice to the State.

Because the State does not challenge the trial court's determination that the sexual profile evidence was relevant character evidence under Rule 404(a), we begin our analysis under Rule 702. We note that the trial court accepted the parties' stipulation to the use of the *Daubert* standard, rather than the *Frye* test. *See Daubert*, 113 S. Ct. at 2795; *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Accordingly, we need not decide whether the adoption of the New Hampshire Rules of Evidence superseded the *Frye* test, *see Daubert*, 113 S. Ct. at 2794; *State v. Cressey*, 137 N.H. 402, 405, 628 A.2d 696, 698 (1993), and we decide this case under the *Daubert* standard and Rule 702.

■ Rule 702 provides that a qualified expert witness may testify, in the form of an opinion or otherwise, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony admitted under this rule "must be reliable to be admissible." *Cressey*, 137 N.H. at 404-05, 628 A.2d at 698. In *Cressey*, we outlined the reasons for this threshold reliability requirement, including the possibility that juries may defer too much to the opinion of experts if the subject matter is beyond common knowledge and everyday experience and if the opinion is given with "the air of authority that commonly accompanies an expert's testimony." *Id.* at 405, 628 A.2d at 698; *see* Myers *et al.*, *Expert Testimony in Child Sexual Abuse Litigation*, 68 NEB. L. REV. 1, 20-21 (1989).

■ The Rule 702 reliability determination lies within the trial court's sound discretion. *Cressey*, 137 N.H. at 405, 628 A.2d at 698. We will reverse the determination as an abuse of that discretion only if the appealing party can demonstrate that the ruling was untenable or unreasonable and that the error prejudiced the party's case. *See id.*; *State v. Whittaker*, 138 N.H. 524, 526-27, 642 A.2d 936, 938 (1994).

The defendant's expert witness, Dr. Allen Brown, would have testified that the defendant lacked the psychological characteristics typically found in sex offenders. He based this opinion upon a sexual history and interviews of the defendant and upon several standardized psychological tests, including the Minnesota Multiphasic Personality Inventory—2 (MMPI-2), the Milon Clinical Multiaxial Inventory—II (MCMI-2), and the Multiphasic Sex Inventory.

■ To the extent that Dr. Brown's conclusions were based on his clinical interview of the defendant and his review of the defendant's sexual history, the trial court granted the State's motion to exclude his testimony. We agree. For the reasons we stated in *Cressey*, such subjective conclusions are not sufficiently reliable to be admissible under Rule 702. *See Cressey*, 137 N.H. at 407-11, 628 A.2d at 699-701.

Dr. Brown did not offer his opinion of the actual guilt or innocence of the defendant. At the hearing on the State's pretrial motion to exclude his testimony, Dr. Brown testified as follows on direct examination:

Question: Now, what is your opinion that you're prepared to testify at trial regarding [the defendant]?

Answer: My opinion would be—my opinion, based on the—testing from the MMPI, the MCMI, the Multiphasic Sex Inventory, from a review of the records and from an extensive interview of [the defendant], would be that he did not show in any of the testing or in any of the interviews the psychological characteristics which are typically found in sex offenders, particularly in child molesters and also particularly in repeat child molesters.

Question: Okay. So it's not your opinion that [the defendant] did or did not commit the charged offenses; is that correct?

Answer: That is correct. Because these tests could not tell whether or not this individual did or did not commit any particular crime. These can only

show whether or not the person has particular psychological characteristics which are most likely to be associated with someone who is a child offender, child sexual offender.

At the hearing, the State offered the testimony of Dr. Anna Salter. She testified that clinical research on sexual offenders demonstrates that such offenders are characterized by their diversity and apparent normality. Dr. Salter concluded that because of this diversity, there is no way to "rule out" a person as a sexual offender by means of these psychological tests.

The evidence offered by the defendant in this case bears a significant resemblance to the evidence we ruled inadmissible in *Cressey*, 137 N.H. at 406-08, 628 A.2d at 699-700. In *Cressey*, we held that the State could not, as part of its case in chief, present the testimony of a psychologist that children had been abused. *Id.* at 411-12, 628 A.2d at 702-03. We found such testimony not to be sufficiently reliable to be admissible under Rule 702 for several reasons, one of which was the fact that the doctor's conclusions were largely based on her interpretation of non-standardized data, and that these conclusions were not sufficiently susceptible to adequate cross-examination. *See id.* at 409-10, 628 A.2d at 701. We also considered it important that "[t]he consensus among scholars is that there are as yet no scientifically reliable indicators of child sexual abuse. There are no symptoms or behaviors that occur in every case of child abuse, nor are there symptoms or behaviors that are found exclusively in child abuse cases." *Id.* at 408, 628 A.2d at 700 (quotation and citation omitted).

Dr. Brown utilized the results of three standardized tests in his evaluation of the defendant. The first, the MMPI-2, is a 1989 revision of the MMPI, a widely used psychological test that has been employed extensively in the evaluation of sexual offenders. *E.g.*, Taslitz, *Myself Alone: Individualizing Justice Through Psychological Character Evidence*, 52 MD. L. REV. 1, 37-38 (1993); Myers, *supra* at 133-34. Comprising several hundred true or false questions, the self-administered test incorporates questions which check its own validity; these validity "scales" are useful when a subject may attempt to answer the questions "in such a way as to be perceived in a more or less favorable light . . . ." Taslitz, *supra* at 37. The other "scales" in the MMPI-2 assess the subject's psychopathology. The MMPI is generally interpreted in terms of profiles, rather than a single scale, the most common interpretation being two-point codes. Taslitz, *supra* at 38.

The MCMI-2 test, like the MMPI-2 test, is designed to measure the presence of psychiatric disorders or maladaptive psychological

or personality traits. The Multiphasic Sex Inventory, specifically designed for sex offenders, evaluates psychological functions related to a person's sexuality, such as sexual dysfunction, sexual deviancy, and sexual knowledge. Dr. Brown's conclusions were primarily based on the results of these normative tests.

Dr. Brown testified that there has been extensive research and clinical use of the MMPI, "with a variety of populations including sexual offenders, . . . convicted sexual offenders and those who were awaiting trial." The published studies in the area of sexual offenders suggest a number of particular profiles, or two-point codes, which may or may not be elevated consistently in offenders, and that the profile of a particular subject will differ depending on prior criminal history, degree of denial, and whether the subject admitted the offense. *E.g.*, Murphy & Peters, *Profiling Child Sexual Abusers: Psychological Considerations*, 19 CRIM. JUST. & BEHAV. 24, 28 (1992).

Dr. Brown and Dr. Salter agreed that sexual offenders are a heterogeneous group, and that there is no single test or battery of tests which can determine *whether* a person is or is not a sexual offender. Dr. Brown would not testify to the defendant's guilt or innocence; rather, he merely offered that the defendant's psychological profile was inconsistent with that of a sexual offender. *See Cressey*, 137 N.H. at 407, 628 A.2d at 699-700. The two experts disagree upon whether child molesters tend to possess certain identifying characteristics that are revealed through psychological testing, thereby enabling a psychologist to determine whether an individual's profile places him within the category of child molesters. Dr. Salter specifically noted that the tests are most effective in diagnosing or classifying individuals who admit to their crime; she testified that the tests suffer from a high failure rate when administered to individuals who deny that they have committed a sex crime.

The published studies in the field support Dr. Salter's point of view. She testified that there is no test or group of tests which can determine if a person is a sexual offender:

> The problem is that many sex offenders do not have any other psychopathology other than the sexual deviancy . . . . [T]he most striking characteristics of sex offenders from the diagnostic standpoint is their apparent normality.
>
> . . . Dr. Brown's testimony [was] that this person does not have the characteristics of a subset of sex offenders, [and] that would have been quite accurate. But the 40 percent of sex offenders who do not have any other

psychopathology or who do not have personality disorders, they are sex offenders, also. So whether—you cannot say that someone does not have the characteristics of a sex offender because he doesn't score in the psychopathological range on psychological tests when close to half of offenders don't score in those ranges anyway. You can only—to be accurate, you can only say that the person doesn't have the characteristics of a particular subset of offenders.

*See* Murphy & Peters, *supra* at 32; Myers, *supra* at 133-35. Dr. Brown disagreed, asserting that by using a battery of tests, researchers had been able to classify a majority of offenders into a *group* of profiles.

In ruling the evidence admissible under Rule 702, the trial court noted several factors that distinguish this evidence from that we held inadmissible in *Cressey*. First, the court noted that the studies involved in *Cressey* were "neither standardized nor quantifiable through a normative scoring procedure," which is not the case with the tests performed on the defendant. Additionally, the court stated that "Dr. Brown's final interpretive steps did not occur in his mind, as was the case" in *Cressey*. We agree with these elements of the court's analysis.

 We cannot agree, however, with the trial court's conclusion that "the State will be able effectively to cross-examine Dr. Brown to expose unreliable elements or assumptions in the tests he applied or to attack his reliance on the results of the particular studies in the literature." In *Cressey*, we were concerned by the fact that "[t]he consensus among scholars is that there are as yet no scientifically reliable indicators of child sexual abuse." *Cressey*, 137 N.H. at 408, 628 A.2d at 700 (quotation omitted). It was in part based upon this concern that we found the expert's testimony in *Cressey* would be "effectively beyond reproach," and, even after cross-examination, "likely to emerge unscathed." *Id.* at 410, 628 A.2d at 701. This was so because the expert's opinion in *Cressey* depended not on any

> one indicator or symptom, but rather on her interpretation of all the factors and information before her . . . . An expert using this methodology may candidly acknowledge any inconsistencies or potential shortcomings in the individual pieces of evidence she presents, but can easily dismiss the critique by saying that her evaluation relies on no one symptom or indicator and that her conclusions still hold true in light of all the other available factors and her expertise in the field.

*Id.* We hold the same to be true in the area of profiling a *suspected* child abuser. Myers, *supra* at 134 ("Given that sex offenders are a heterogeneous group, it is understandable that research findings have been equivocal."); Murphy *et al., Offender Treatment: The Perils and Pitfalls of Profiling Child Sex Abusers,* 7 THE APSAC ADVISOR 3, 4 (1994) ("No particular profile predicts a propensity for sexual offending. A significant proportion of offenders may exhibit no measurable psychopathology."); Erickson *et al., Frequency of MMPI Two-Point Code Types Among Sex Offenders,* 55 J. CONSULTING & CLINICAL PSYCHOL. 566, 569 (1987) ("Attempts to identify individuals as likely sex offenders on the basis of their MMPI profiles are reprehensible, although they are becoming increasingly common as accusations of child sex abuse grow in frequency."). Accordingly, we reverse the trial court's ruling that the testimony is admissible, and remand the case for proceedings consistent with this opinion.

*Reversed and remanded.*

All concurred.