Paul ISELY, Plaintiff,

v.

CAPUCHIN PROVINCE, et al., Defendants.

No. 93–CV–74820–DT.

United States District Court, E.D. Michigan, Southern Division.

March 7, 1995.

See also, 878 F.Supp. 1021.

Heidi L. Salter and Don Ferris, Ann Arbor, MI, for plaintiff.

James N. Martin and Michael R. Janes, Mt. Clemens, MI, for defendants Capuchin, St. Lawrence, Thiel, Hoelscher, Kowalsky, Werner Wolf and Smith.

Frank W. Brochert, Detroit, MI, for Jim Wolfe, Gerald Boyle, Milwaukee, WI, for defendant Leifeld.

## OPINION AND ORDER REGARDING ADMISSIBILITY OF TESTIMONY OF PLAINTIFF'S PSYCHOLOGICAL EXPERTS

ROSEN, District Judge.

### I. INTRODUCTION

This matter is presently before the Court on two motions *in limine* filed by Defendants, one submitted just before trial and one submitted during trial, to preclude or limit the scope of the testimony of Plaintiff's psychological experts, including Dr. Carol Hartman, who is Plaintiff's treating therapist. She is being offered not only as the treating psychologist of Plaintiff Paul Isely, but also as an expert in the area of post-traumatic stress disorder ("PTSD") and repressed memory.

The Defendants argue in their first *in limine* motion, that repressed memory is not sufficiently recognized within the field of psychology (i.e., that it lacks scientific reliability and validity) such that expert testimony may be taken on it. Therefore, Defendants urge that the Court neither recognize the theory permit expert testimony about repressed memory.[1]

The second motion *in limine* brought by the defense is to preclude Dr. Hartman from testifying as to the truth of the matters asserted by Mr. Isely; in other words, that Dr. Hartman be precluded from vouching for the truth of Mr. Isely's allegations about his suffering of sexual abuse during the period

---

1. This motion was filed shortly before trial. The court considers this motion as intending to preclude not only the testimony of Dr. Hartman concerning repressed memory, but also that of Dr. John Wilson, Plaintiff's second expert on post-traumatic stress disorder and repressed memory.

that he was at St. Lawrence Seminary and the pre-Novitiate here in Detroit.[2]

## II. DISCUSSION

Admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Admissibility of evidence concerning the bases of an expert's opinion is governed by Fed.R.Evid. 703, which provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The Sixth Circuit recently discussed the scope and standards applicable in deciding questions of admissibility under Rule 702 in *American & Foreign Insurance Company v. General Electric Company*, 45 F.3d 135 (6th Cir.1995). As explained by the Sixth Circuit,

"Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 341 (6th Cir.1993). Until recently this court used a four-part test to examine the admissibility of expert testimony: " '(1) a qualified expert (2) testifying on a proper subject (3) which is in conformity with a generally accepted explanatory theory (4) the probative value of which outweighs its prejudicial effect.' " *Id.* (quoting *Sterling*

*v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1208 (6th Cir.1988)).

45 F.3d at 137.

However, as the *American & Foreign Insurance* court noted, the once accepted four-part test used to determine the admissibility of expert testimony has been substantially superceded by the Supreme Court's recent ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the Court significantly modified the third "general acceptance" prong of the test, holding that general acceptance is *not* an absolute prerequisite to admissibility. The *Daubert* court explained its rationale:

Nothing in the text of this Rule [Fed. R.Evid. 702] establishes "general acceptance" as an absolute prerequisite to admissibility. Nor does respondent present any clear indication that Rule 702 or the Rules as a whole were intended to incorporate a "general acceptance" standard. The drafting history makes no mention of *Frye*[3] and a rigid "general acceptance" requirement would be at odds with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony".... Given the Rules' permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention "general acceptance", the assertion that the Rules somehow assimilated *Frye* is unconvincing. *Frye* made "general acceptance" the exclusive test for admitting expert scientific testimony. That austere standard, absent from and incompatible with the Federal Rules of Evidence, should not be applied in federal trials.

—— U.S. at ——, 113 S.Ct. at 2794.

The Court went on to hold that, rather than meeting a "general acceptance" standard, in order to be admissible under Rule 702, expert testimony must meet a standard of "evidentiary reliability". According to the *Daubert* Court, "evidentiary reliability" requires that proposed expert testimony be

---

2. This motion was filed during trial and just before the testimony of Dr. Hartman.

3. *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923). It was in *Frye* that the "general acceptance" requirement was first established.

"supported by appropriate validation—i.e., 'good grounds', based on what is known." *Id.* at ——, 113 S.Ct. at 2795. The Court denominated the district courts as the "gatekeepers" of such evidence, and then delineated guidelines to assist the trial courts in screening expert testimony for such evidentiary reliability. Under the *Daubert* guidelines, the trial court should determine:

(1) Whether the theory in question can be or has been tested;

(2) Whether the theory has been subjected to peer review and publication;

(3) The known or potential rate of error; and

(4) Whether there has been widespread acceptance of the theory in the relevant scientific community.

*Id.* at —— — ——, 113 S.Ct. at 2796–97 (enumeration added).

Importantly, the Court emphasized that these guidelines are not to be viewed as an exclusive, exhaustive or definitive test for admissibility, but rather are meant to be flexible. *Id.* at ——, 113 S.Ct. at 2797. The Court further reminded the lower courts that, in assessing a proffer of expert scientific testimony, they should also be mindful of the interplay of other rules, in particular, Fed.R.Evid. 703. As the *Daubert* court observed:

Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data

are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Id.* at —— – ——, 113 S.Ct. at 2797–98.

The Court further noted that evidence admissible under Rules 702 and 703 may still be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* at ——, 113 S.Ct. at 2798.

In the year and a half since the *Daubert* decision, only a few courts have had occasion to apply *Daubert's* "evidentiary reliability" standards in the context of expert psychological testimony concerning allegations of childhood sexual abuse and post-traumatic stress disorder, repressed memory or traumatic amnesia. *See, Gier v. Educational Service Unit No. 16*, 845 F.Supp. 1342 (D.Neb.1994); *State v. Alberico*, 116 N.M. 156, 861 P.2d 192 (1993); *State v. Hypolite Foret*, 628 So.2d 1116 (La.1993); *State v. Cressey*, 137 N.H. 402, 628 A.2d 696 (1993); *United States v. Buenaventura*, 40 M.J. 519 (A.C.M.R.1994).

*Gier* was a civil action brought on behalf of seven mentally retarded students in a state-run school predicated upon allegations of physical and sexual abuse by employees of the school. The defendants filed a motion *in limine* to exclude the psychological testimony of a psychiatrist, Dr. Scanlan, and two psychologists, Drs. Sullivan and Jones.[4] These three proposed witnesses examined the plaintiffs and, as a result of their examinations,

---

4. This motion *in limine* was filed by the defendants well prior to trial and the court conducted a hearing on the matter prior to trial to determine the foundation for, and proposed scope of, the proffered expert testimony. In terms of an appropriate case management approach to resolving this type of evidentiary issue, this Court believes that this is clearly the preferable approach, particularly where the proffered expert testimony forms such a critical basis for the claims and defenses of the parties. (Indeed, it is this Court's view that in those cases where testimony proffered by the expert is fundamental to a party's claim or defense, the ideal case management approach to resolving motions to preclude or limit expert evidence would be prior to, or as part of, dispositive motion practice.)

Here, unfortunately, although fundamental to Plaintiff's case and Defendants' defenses, the instant motions were not filed until shortly before and during trial. Although permissible at any

point, it strikes the Court that theses motions should, for most effective adjudication of the issues, have been filed far earlier in this litigation. But, they were not, and the Court determined that the most judicially economical manner with which to proceed with these motions would be to take all of Dr. Hartman's *foundational* testimony, including cross-examination by Defendants, concerning her own qualifications and experience, and both her knowledge of the field of repressed memory and that theory's own history and acceptance in the filed of psychology, in general, in front of the jury. The Court indicated it would then excuse the jury and rule on the admissibility and scope of Dr. Hartman's testimony.

Although not the optimal approach for resolution of such issues, the Court is persuaded that, in this instance, the approach was efficacious of a proper resolution and not prejudicial to the parties.

determined that the plaintiffs had been sexually, physically and emotionally abused. The plaintiffs proposed to offer the testimony of these witnesses as experts in the detection of such abuses, as well as substantive evidence that the alleged abuses, in fact, occurred and that they took place at the school.

The trial court applied the four *Daubert* guidelines and concluded that the proffered expert witnesses' proposed testimony was unreliable. In reaching its conclusion, the *Gier* court was particularly concerned with the methodologies employed by the psychiatrists and psychologists who examined the allegedly abused mentally retarded plaintiffs. The court found that the methodologies employed failed to account for the plaintiffs' mental retardation and that none of the proposed experts had any expertise in the field of mental retardation.

Further, the court determined that the witnesses compared the behavior of the mentally retarded plaintiffs to a model accepted in evaluating abuse of *non* -retarded children, and when used for retarded children the model had never been subjected to peer review.

The proposed witnesses also had used the Child Behavior Checklists ("CBC") test in reaching their conclusion that the plaintiffs had been abused. However, the witnesses admitted that the CBC had never been validated for use with mentally retarded children. They further acknowledged that the CBC contains very few questions about sexual behavior and that an instrument, the Child Sexual Behavior Inventory (the "CSBI"), had been developed which focuses more directly on sexual behavior but there was no evidence in the record to suggest that the CSBI was used in the evaluation of any of the plaintiffs.

Further, there was nothing in the record to demonstrate that the clinicians who conducted the clinical interviews with the plaintiffs were trained in line with any standardized validated interview protocol or methodology. Additionally, the court had no way of evaluating the actual methodologies utilized by the evaluation teams because no verbatim records were kept of any of the interviews.

No video or audio tapes were ever made and no contemporaneous notes of the interviews were retained.

Based upon the foregoing, the *Gier* court concluded:

> Plaintiffs have failed to demonstrate by a preponderance of the evidence that their experts' methodologies for evaluating the plaintiffs in this particular case are reliable for the investigative purposes plaintiffs now seek to use them. The witnesses all testified that their purposes in evaluating plaintiffs were for the provision of therapy, not investigation. The methods used here may well have been sufficiently reliable for purposes of choosing a course of psychotherapy for these disturbed children, a course which must, to some extent, rely upon perception as well as reality, and upon the subjective reports of parents and others. However, the methodologies have not been shown to be reliable enough to provide a sound basis for investigative conclusions and confident legal decision making. *See, Daubert,* [——] U.S. [at ——], 113 S.Ct. at 2796 (" 'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity of other, unrelated purposes.")
>
> It may be that current standardized methodologies, if shown to have been adhered to rigorously, might satisfy the *Daubert* requirements and meet the standards of Rule 702, but the plaintiffs have failed to show that such standards were met in this case. Given the plaintiffs' retardation and communicative difficulties, the lack of evidence demonstrating the precise methods used and their reliability, I cannot conclude that the witnesses' opinions regarding abuse are sufficiently reliable to be admissible under the rules.

845 F.Supp. at 1353.

Accordingly, the court severely limited the scope of the psychological experts' proposed testimony:

> Based upon the Eighth Circuit's decision in *United States v. Whitted,* [11 F.3d 782 (8th Cir.1993) ],[5] and the evidence present-

---

**5.** *Whitted* is a post-*Daubert* decision concerning

the testimony of a physician that, based on the

ed by the parties regarding the *Daubert* hearing, I have made the following conclusions regarding the proffered testimony of Scanlan, Sullivan and Jones. These witnesses may not testify that any plaintiff was abused in any manner, nor may they testify to any opinion based on that conclusion.... The witnesses may testify to the characteristics of non-retarded abused children; they may testify to the behaviors plaintiffs exhibited which are consistent with those behaviors, limited to those which the witnesses personally observed.... Finally, the witnesses may not testify as to any opinion that plaintiffs' behavior is consistent with abuse of any kind. While *Whitted* generally allows such testimony, plaintiffs have failed to demonstrate the reliability of the bases for such opinion testimony as required by *Daubert*.

*Id.* (citations and footnote omitted).

In *State v. Alberico*, 116 N.M. 156, 861 P.2d 192 (1993), the New Mexico Supreme Court was called upon to decide whether the trial courts in two consolidated criminal rape cases [6] correctly admitted expert psychological opinion testimony to the effect that the alleged rape victims suffered from post-traumatic stress disorder ("PTSD") consistent with sexual abuse. The prosecution in both cases stated that the purpose of the State's proffered psychologist testimony was to prove that a crime was committed. The qualifications of the psychologist were not challenged; rather the issue was the content of the psychologist's testimony.

The State's psychological witness, Dr. Lenssen, who examined and evaluated the complainants, testified in voir dire hearings that PTSD is a diagnosis for a psychological condition that may result from an incident that is beyond the normal range of experience and which would be distressing to anyone. Dr. Lenssen relied upon the American Psychiatric Association's "Diagnostic and Statistical Manual of Mental Disorders," 3d rev.ed. (the "DSM III–R") explaining that she patterned her evaluation of the complain-

ants after the DSM III–R. She testified that one of the traumatic experiences that may cause PTSD is rape, and that PTSD induced by rape is sometimes referred to as "rape trauma syndrome" or "RTS".

Dr. Lenssen stated that PTSD and RTS are generally accepted by national organizations of both psychiatrists and psychologists, however, she explained that while RTS is generally accepted in the research community by clinical psychologists, it is not listed in the DSM III–R manual as is PTSD.

In addition, Dr. Lenssen testified that, in evaluating an alleged victim, a psychologist is unable to determine whether or not the victim is telling the truth. Rather, what a psychologist does is check the victim's story for internal consistency.

Dr. Lenssen stated that she interviewed the complainant in *Alberico* twice and her mother once. She also administered two validated psychological tests to the complainant. From her evaluation of the complainant's symptoms, Dr. Lenssen testified that she diagnosed the complainant as suffering from PTSD consistent with someone who suffered from sexual abuse or rape.

In *Marquez*, Dr. Lenssen testified that she examined the complainant and based upon her examination, she concluded that the complainant suffered from PTSD. She stated that although several stressors which could cause PTSD may be present in a patient at one time, the cause could be traced, and she believed that the complainant's symptoms could be traced to sexual abuse.

Dr. Lenssen also testified that in her opinion, the complainant in *Marquez* was not fabricating her story. As in *Alberico*, however, she further testified that the PTSD diagnosis is not a credibility assessment, and that it makes a difference whether the complainant is telling the truth.

Over the objection of defense counsel, the *Alberico* trial judge ruled that the State had

---

physical examination of an alleged child sex-abuse victim and the patient's statements, he concluded the child had been sexually abused. The opinion, however, does not discuss the *Daubert* factors. See *Gier*, 845 F.Supp. at 1347, n. 9.

6. The *Alberico* case was consolidated on appeal with *State v. Marquez*.

laid a proper foundation for the PTSD testimony and that such testimony was inherently reliable. As to relevancy, the trial judge ruled that PTSD testimony was admissible and would help the jury determine whether a crime had been committed, but was not admissible to bolster the credibility of the complainant. The judge concluded that PTSD testimony was based on well-recognized scientific principles and that its probative value outweighed its potential prejudicial effect.

Similarly, in *Marquez*, the trial court ruled that PTSD testimony would help the jury (1) to understand the behavior of sexually abused children because it was a subject that was beyond the knowledge of lay persons and (2) to determine whether a crime had been committed. The court also found that the potential prejudice of the testimony to the defendant did not outweigh its probative value, but that no direct testimony regarding the truthfulness of the complainant's account would be admissible.

On appeal both defendants argued that the State failed to lay the proper scientific foundation for the admission of PTSD testimony, arguing that PTSD evidence is not generally accepted as a reliable means for determining whether sexual abuse had occurred. The defendants also argued that, although PTSD testimony may be admitted if its purpose is to explain the victim's delayed reporting of the incident, an expert could not testify that an alleged victim's symptoms of PTSD are consistent with those exhibited by someone who has been sexually abused because such testimony lacks an objective scientific foundation.

The state court of appeals agreed with the defendants and reversed their convictions. The New Mexico Supreme Court reversed the Court of Appeals.

In reaching its conclusion that no error was committed in admitting PTSD expert testimony, the New Mexico Supreme Court relied upon the plain language of Rule 702 of the New Mexico rules of evidence, SCRA 1986, 11–702 (which is identical to Fed. R.Evid. 702), and the United States Supreme Court's *Daubert* decision. The *Alberico/Marquez* court explained:

We discern three prerequisites in Rule 702 for the admission of expert opinion testimony. The first requirement is that the expert be qualified. As noted earlier the qualifications of the experts in these cases were not contested, and thus is not an issue on appeal.

The second consideration for the admissibility of scientific evidence in the form of expert testimony is whether it will assist the trier of fact.... Put another way, the relevant inquiry is, "On this subject can a jury from this person receive appreciable help." ...

The third requirement in Rule 702, which is closely related to assisting the trier of fact, is that an expert may testify only as to "scientific, technical or other specialized knowledge." Scientific knowledge is what distinguishes Rule 702 expert opinion testimony from Rule 701 lay opinion testimony, which requires personal observation.... "Presumably, this relaxation of the usual requirement of first-hand knowledge is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, [——] U.S. [——, ——], 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993).

861 P.2d 192, 202.

With respect to this reliability requirement, the New Mexico court explained:

When scientific evidence is employed as a means of obtaining or analyzing data, the trial court must determine whether the scientific technique is based upon well-recognized scientific principle and whether it is capable of supporting opinions based upon reasonable probability rather than conjecture.... Thus, the focus should not be solely on whether the scientific technique has gained general acceptance within its particular field. Rather it should be on the validity and soundness of the scientific method used to generate the evidence.

\*     \*     \*     \*     \*     \*

Although this may merely be a matter of semantics, reliability has been defined as a measure of bringing about consistent re-

sults, and validity is seen as proof of the technique's ability to show what it purports to show. . . .

We view validity and reliability as being scientifically interrelated, with the concept of validity encompassing the concept of reliability. In other words, if a particular scientific technique brings about consistent results, that is one element of validity, that is, proof of the technique's ability to show what it purports to show. While one concept embraces the other in a scientific sense, however, legally the two concepts are related to two separate evidentiary issues. Validity is the measure of determining whether the testimony is grounded in or a function of established scientific methods or principles, that is scientific knowledge. Reliability is akin to relevancy in considering whether the expert opinion testimony will assist the trier of fact.

Several factors could be considered by a trial court in assessing the validity of a particular technique to determine if it is "scientific knowledge" under Rule 702. . . . First and foremost is the technique's relationship with established scientific analysis. For example, a technique that is grounded in traditional psychiatric or psychological principles, whether or not it is generally accepted, might be found to be admissible. . . . The availability of specialized literature addressing the validity of the technique and whether the technique is generally accepted are two more factors to consider because they bear on the likelihood that the scientific basis of the new technique has been exposed to critical scientific scrutiny.

*Id.* at 203–204.

With respect to the precise issue of the validity and reliability of PTSD testimony in *Alberico* and *Marquez,* the New Mexico court stated:

We hold that PTSD testimony is grounded in valid scientific principle. DSM III–R is specialized literature that specifically catalogues the symptoms of mental disorders and prescribes the methods by which the psychological evaluation should take place. DSM III–R, according to the State's experts, is widely used in court-rooms, not only for issues of sex abuse, but for issues concerning sanity and competency as well. PTSD is generally accepted by psychologists and psychiatrists as a valid technique for evaluating patients with mental disorders. The existence of DSM III–R and its general acceptance in psychology indicate that PTSD has been exposed to objective scientific scrutiny and empirical verification.

Furthermore, the PTSD diagnosis appears to be grounded in basic behavioral psychology. . . . DSM III–R accumulated the symptoms of mental disorders by examining human reactions to certain events or stimuli. . . . In evaluating an alleged victim of sexual abuse, the psychologist compares her symptoms with known reactions to sexual abuse and attempts to correlate the victim's symptoms with known causes of behavior that have been categorized. In that way, the PTSD diagnosis is no different from any other method or technique in behavioral psychology.

In addition, several jurisdictions that have disallowed PTSD testimony on the issue of whether sexual abuse occurred emphasized that psychologists could not pinpoint the cause of the PTSD although they could diagnose the symptoms. In the present cases, however, the experts testified that psychologists can isolate the cause of the symptoms because different stressors manifest themselves in different symptoms. . . .

All of the expert testimony in these two cases establishes that victims of sexual abuse may exhibit identifiable symptoms that have been catalogued in DSM III–R. If a complainant suffers from PTSD symptoms, it indicates that she might have been sexually abused. Thus, testimony regarding a complainant's PTSD symptoms has the tendency to show that she might have been sexually abused.

861 P.2d at 208.

Accordingly, the *Alberico/Marquez* court held that PTSD evidence is valid and probative, and admissible for establishing whether the alleged victim exhibits symptoms of PTSD that are consistent with rape or sexual abuse. *Id.* at 210.

The New Mexico court went on to hold, however, that expert PTSD testimony was inadmissible as to credibility:

> While PTSD testimony may be offered to show that the victim suffers from symptoms that are consistent with sexual abuse, it may not be offered to establish that the alleged victim is telling the truth; that is for the jury to decide.... Each of the experts in both of these cases testified that while they try to determine if the victim's story is inherently consistent, that does not translate into a determination of whether the victim is telling the truth.... The experts testified that it was not their function to pass on the credibility of complainants in the legal sense. Accordingly, we expressly prohibit direct testimony regarding the credibility or truthfulness of the alleged victim of sexual abuse....
>
> We are aware that Rule 704 permits testimony in the form of an opinion or inference even though such testimony embraces an ultimate issue to be decided by the jury. However, Rule 704 was not intended to permit experts to tell the jury what result to reach. When the only evidence consists of the victim's accusation and the defendant's denial, expert testimony on the question of who to believe is nothing more than advice to jurors on how to decide the case. Such testimony was not legitimized by Rule 704, and is not admissible under Rule 702.

*Id.* at 211.

The court further held that PTSD testimony is inadmissible to identify the perpetrator of the alleged sexual abuse. The court explained:

> In addition to prohibiting expert testimony as to the alleged victim's credibility, the expert may not testify as to the identity of the alleged perpetrator of the crime.... Allowing such testimony encroaches too far upon the jury's function as arbiter of the witnesses' credibility. Although a psychologist can independently evaluate the victim's allegations of sexual abuse by cross-checking her symptoms with those recognized in DSM III–R, there appears to be no similar verification for identifying the alleged abuser. The psychologist must rely in large part upon the victim's story, and allowing the psychologist to testify as to the identity of the accused serves only to repeat what the complainant told the examining expert and thus bolster her credibility.

*Id.*[7]

Based upon its review of the foregoing authorities, the Court has determined that the following parameters will apply in determining the admissibility of the testimony of the PTSD or repressed memory psychological experts offered by any of the parties in this case.

■ First, *Daubert* and other post-*Daubert* cases, including the Sixth Circuit's recent decision in *American & Foreign Insurance Company v. General Electric Company, supra,* make clear that the initial foundational requirement a proponent of expert scientific testimony must meet as a pre-requisite to admissibility is to establish that the witness is qualified by virtue of his/her education and training to give such opinions. Thus, in order to give expert opinion testimony at all in this case, the proposed expert must lay a foundation for that expert opinion by establishing that his/her qualifications as a practitioner and treater in the field of psychology and, by virtue of his/her education and training, is sufficient to give him/her expertise or special knowledge such that any opinions that the expert has will be of assistance to the jury in its fact-finding responsibilities.

The next piece of the foundation which must be laid for the admission of the proposed expert testimony is a showing that not only is the expert qualified by virtue of his/her training and education, but also that he/she has personal experience in treating

---

7. *See also, State v. Cressey,* 137 N.H. 402, 628 A.2d 696 (1993) (applying a *Daubert* "evidentiary validity" analysis and finding sexual abuse psychological testimony admissible under state rules of evidence patterned after the Federal Rules); *United States v. Buenaventura,* 40 M.J. 519 (A.C.M.R.1994) (applying *Daubert* in case involving Rule 702 of the Military Rules of Evidence and expert psychiatric testimony concerning child sexual abuse). *Cf. State v. Foret,* 628 So.2d 1116 (La.1993).

people who have experienced post-traumatic stress disorder, traumatic amnesia and/or repressed memory.

■ Once the proposed expert has crossed the foundational threshold of establishing his/her personal background qualifications as an expert, he/she must then move to the subject matter in question and provide further foundational testimony as to the validity and reliability of post-traumatic stress disorder and repressed memory. The Court believes that it is at this point that the foundational requirements of Rules 702 and 703 intersect. While Rule 702, in its requirement that the expert testimony be able to "assist the trier of fact to understand the evidence or determine a fact in issue", clearly encompasses the pre-requisite that the information itself which the expert imports be scientifically supportable, the focus of that Rule is aimed at the personal qualifications of the expert to give opinions about the subject matter in question. Rule 703 focuses on the bases, or foundations, for the opinion evidence, and requires that the underlying data and studies which support the opinion be reliable. The focus of this Rule is clearly on the reliability and validity of expert opinion testimony because the Rule, by its terms, permits the use of otherwise inadmissible evidence, so long as it is "of a type reasonably relied upon by experts in the particular field." By permitting the use of otherwise inadmissible evidence (such as hearsay about studies or experiments conducted by others), the Rule clearly contemplates a foundational requirement that the underlying data which supports an expert's opinion be reliable.

Therefore, in laying this part of the foundation as to the validity and reliability of repressed memory or post-traumatic stress disorder or traumatic amnesia, the proffered expert must be able to assure the Court that his/her theories have some degree of scientific validity and reliability. In particular, the witness should testify as to whether that theory can be, or has been, tested or corroborated and, if so, by whom and under what circumstances; whether the theory has been proven out or not proven out under clinical tests or some other accepted procedure for bearing it out; and whether the theory has

been subjected to other types of peer review. In establishing this, the expert must show that any underlying data and studies upon which he/she relies are of a type reasonably relied upon in his/her field. In other words, in the context of this case, the witness must be able to show, through the use of reliable, viable extrinsic evidence, whether repressed memory or post-traumatic stress disorder is a theory that is accepted in the field of psychology, and if so, to what extent. Obviously this part of this foundational element will include testimony as to whether or not the theory of repressed memory is widely accepted in the field of psychology.

As is clear from a reading of *Daubert*, none of these foundational criteria is independently determinative or definitive on the issue of admissibility. Rather, all of the testimony regarding this foundational reliability and validity prong must be considered as a whole.

Assuming that the expert's testimony sufficiently satisfies these foundational requirements, then he/she will be permitted to give opinions as to repressed memory, its validity and reliability, and whether or not Mr. Isely has, in fact, experienced repressed memory and/or post-traumatic stress disorder.

### THE TESTIMONY OF DR. HARTMAN

■ On February 17, 1995, the Court heard the foundational testimony of Plaintiff's first proposed psychological expert, Dr. Carol Hartman. Dr. Hartman testified that she has a doctorate in psychiatric nursing. She received her Bachelor's and Master's degrees in nursing from UCLA, and completed her doctorate at Boston University in 1967. She became an assistant professor of psychiatric nursing at Boston College in 1966 and in 1987 she became a full professor. Her teaching duties include teaching psychiatric mental health nursing to masters and doctoral candidates. Her focus is on clinical teaching. She also teaches two theory courses: systems theories and stress trauma. This latter course focuses on the psychological problems and treatment of children of war, rape victims, child prostitutes and survivors of homicides. Included within the

scope of the course is a study of post-traumatic stress disorder.

Dr. Hartman further testified that she has published 80–90 articles and several book chapters on post-traumatic stress disorder, including PTSD in the context of understanding rape trauma. Among articles and book chapters that she has authored are articles on information processing of trauma, which included discussions of how the brain functions before and after trauma with a focus on the memory of children in adolescence. She stated that her writing regarding PTSD and repressed memory focuses on trying to bring forward biological aspects of memory based on a model developed in 1988. She testified in detail that many of her writings on the subject of PTSD and repressed memory have been subjected to peer review.

By way of further foundation, Dr. Hartman testified that from 1984 through 1991, Dr. Hartman served on the national committee which developed the post-traumatic stress disorder diagnostics in the third and fourth editions of the Diagnostic and Statistical Manual (the "DSM III–R" and the "DSM IV–R"). This committee accumulated criteria concerning PTSD and sent the criteria out to the psychological community for clinical testing.

Dr. Hartman testified that PTSD did not get into the DSM diagnostic until the 1980s. She testified that traumatic amnesia is a totally separate diagnosis from PTSD, and explained that traumatic amnesia is best defined as forgetting an event, having no idea or awareness that a traumatic event ever occurred.

Dr. Hartman has also spoken at several psychiatric conferences on rape trauma on children. She never has presented specifically on the effect of rape on memory.

In addition to her teaching duties, Dr. Hartman explained that she has had an independent private clinical practice since 1964. She obtained her national certification in psychiatric nursing in the mid–1970's and is licensed as an advanced practice nurse in the State of Massachusetts. As an advanced practice nurse in Massachusetts, she can have a private practice, write prescriptions and can apply for admitting privileges at hospitals much like a physician. She is not qualified to evaluate patients for competency, however. Her practice over the last 20 years involves approximately 60 patients, all of them long-term.

In her private practice, Dr. Hartman testified that she has treated numerous patients suffering from PTSD and repressed memory, some of whom she has worked with over a 4–5 year period. She stated that she began treating PTSD/repressed memory patients in the late 1970s or early 1980s.

■ With respect to the validity of post-traumatic stress disorder and repressed memory and the reliability of the data which supports her opinions, Dr. Hartman testified that although repressed memory cannot be tested empirically, there have been a number of studies conducted. She discussed at length the results of two recent survey-type studies. One study, published in Volume III of the 1994 American Psychological Bulletin, surveyed 250 men and 250 women under the age of 45. Of those surveyed 23.9% reported that they had been abused as children, and of that abused group, 40% reported a period of not remembering part of the abuse. She explained that there was very little difference between men and women.

Dr. Hartman testified that there is a fair degree of acceptance of the concept of repressed memory in the field. She opined that the majority of clinicians accept the concept. However, she noted that, although PTSD is a diagnostic category in both the DSM III– and the DSM IV–R, repressed memory is not. She also acknowledged that there are detractors who do not accept the theory. One of those major detractors, Elizabeth Loftus, of the University of Washington, conducted studies on eyewitness identification. However, Loftus's work has been countered by others in the field. So, although the concept of repressed memory has gained some adherents in the field of psychology, that acceptance is not universal.

Finally, Dr. Hartman opined that the greatest controversy with respect to repressed memory is specifically in the area of

elicitation of repressed memories, not with the concept itself.

Based upon the foregoing foundational testimony, the Court finds that Dr. Hartman has met the foundational requirements to testify regarding PTSD and repressed memory. It is not within the province of this Court to decide the ultimate issues of this case; i.e., whether Mr. Isely has truly experienced PTSD and/or repressed memory such that he is excused from the operation of the statutes of limitations. That will be for the jury to decide.

Rather, under *Daubert,* the Court perceives its role with respect to the admissibility of expert testimony as being a "screener" of expert testimony, similar to its role under Fed.R.Evid. 104(b) of screening conditionally relevant evidence. Under Rule 104(b), if the relevance of evidence depends upon the truth, or fulfillment, of a fact or condition, it is the court's function only to insure that there is sufficient evidence in the record from which a jury could infer or find support for the truth of those facts or fulfillment of the condition. Once that measure of evidence is found to exist to support the condition or fact, it is up to the jury to ultimately determine whether the factual condition is fulfilled and whether the evidence is relevant.[8]

Thus, in the context of the court's role as "gatekeeper" of expert testimony in this case, the Court must assure that, first, there is a solid foundation for the proposed expert witness's testimony by virtue of her education, her training, her readings, her teachings and her work experience so as to give the court confidence that the witness is competent to provide specialized knowledge and assistance to the jury. Secondly, the witness must be able to persuade the court that she has sufficient background and training specifically related to her theory to be able to testify as to the theory's validity and reliability, and then to be able to establish that the theory, itself, does have some degree of validity and reliability. This latter step can be met by showing whether the theory has been subjected to empirical testing, and/or peer review.

In this case, Dr. Hartman knowledgeably testified about several studies which have validated the theory of repressed memory. Whether other experts agree with the theory or not, because there is no absolute empirical way to prove that (1) an event happened and/or (2) that the memory of it was repressed, it will be up to the jury to determine the probative value of Dr. Hartman's opinion. In the Court's view, there is a sufficient scientific basis of support for the theory in Dr. Hartman's field of expertise, through the studies and writings, to permit the issue to go to the jury.

For the foregoing reasons, the Court finds that Dr. Hartman is qualified to testify as an expert and give opinion testimony regarding PTSD and repressed memory in this case.[9]

Specifically with respect to what opinion testimony may be elicited from Dr. Hartman as a result of that testimony, assuming that she testifies that Mr. Isely is in fact suffering from post-traumatic stress disorder and repressed memory, expert testimony is subject to precisely the same rules of evidence as is all other testimony and evidence. Thus, Dr. Hartman's testimony is subject to Rules 401 and 403 concerning relevance and whether the probative value of the testimony is substantially outweighed by a danger of unfair prejudice to the defendants or whether the testimony could lead to confusion in the minds of the jurors. It is, of course, also subject to the Court's instructions concerning

---

**8.** Although the court's role under Rules 702 and 703 is similar in function to its role under Rule 104(b), the Court believes the level of foundational proof as a condition of admissibility is higher under Rule 702 and 703. It is not sufficient that there be merely "some" evidence in the record. Rather, the foundational proof for expert testimony must be of a level sufficient to support reasonable inferences and conclusions, and not leave the jury simply in the realm of conjecture or guesswork.

**9.** Although the testimony of Plaintiff's other expert, Jr. John Wilson, was not specifically challenged by Defendants independently from that of Dr. Hartman, the Court would, based on his foundational testimony, also find him qualified to give expert opinion testimony on PTSD and repressed memory.

 

circumstantial evidence and what jurors may do with circumstantial evidence.

Therefore, the Court holds that Dr. Hartman may not only testify as to her theories and opinions concerning PTSD and repressed memory, but also will be permitted to testify as to whether Mr. Isely's behavior is consistent with someone who is suffering repressed memory or post-traumatic stress disorder.

However, she may go no farther in her opinions. It is clear to the Court that, based even on her own testimony, she should not be permitted to testify that she either believes Mr. Isely or believes that the incidents he alleges occurred, since she has specifically admitted that she has no empirical way of factually establishing in fact whether the underlying facts occurred. Such testimony would invade the province of the jury by vouching for the credibility of Isely and would, in any event, be unhelpful to the jury since everything she knows about the alleged events is hearsay from Mr. Isely (and perhaps from the deposition testimony of Gale Leifeld).

Thus, Dr. Hartman may testify concerning repressed memory, give her opinions about it, and she can testify as to whether Mr. Isely, in her belief, has experienced or suffers from repressed memory. She would also be permitted to testify that his conduct and behavior, as she has observed it, is consistent with people who have experienced PTSD/repressed memory and is consistent with people who have suffered abuse. This is all, the Court believes, within the realm and scope of Dr. Hartman's qualifications by virtue of her training, education, background, and treatment experience with Isely and other patients.

Defendants may cross-examine on any range of issues including whether Plaintiff's symptoms are also consistent with somebody who fantasizes about such events and believes them himself, or is susceptible to having "memories" implanted in his subconscious, or any other range of issues that may go to the basis of Dr. Hartman's opinion as to whether or not Mr. Isely's symptomology is consistent or inconsistent.

## CONCLUSION

Based on the foregoing,

IT IS HEREBY ORDERED that Defendants' motion *in limine* to preclude *in toto* testimony concerning PTSD and repressed memory syndrome be, and hereby is, DENIED.

IT IS FURTHER ORDERED that Defendants' motion *in limine* to preclude certain testimony from Plaintiff's experts, is GRANTED, in part, and DENIED, in part.